UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| RUTH C.[1], ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v.  ) | Case No. 1:20-cv-30 |
| ) | |
| ANDREW M. SAUL, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## REPORT AND RECOMMENDATION

This matter is before the court on a referral for a Report and Recommendation on the petition for judicial review of the decision of the Commissioner filed by the plaintiff, Ruth C., on January 17, 2020. For the following reasons, the court **RECOMMENDS** that the decision of the Commissioner be **AFFIRMED.**

*Background*

The plaintiff, Ruth C., filed an application for Disability Insurance Benefits on May 30, 2017, alleging a disability onset date of February 9, 2016. (Tr. 17). The Disability Determination Bureau denied Ruth C.'s application initially on September 21, 2017, and again upon reconsideration on November 15, 2017. (Tr. 17). Ruth C. subsequently filed a timely request for a hearing on December 15, 2017. (Tr. 17). A hearing was held on October 16, 2018, before Administrative Law Judge (ALJ) Terry Miller, and the ALJ issued an unfavorable decision on December 13, 2018. (Tr. 17-27). Vocational Expert (VE) Amy Kutschbach appeared (via telephone) and testified at the hearing. (Tr. 17). The Appeals Council denied review making the ALJ's decision the final decision of the Commissioner. (Tr. 1-4).

---

[1] To protect privacy, the plaintiff's full name will not be used in this Order.

Ruth C. last met the insured status requirements of the Social Security Act on September 30, 2018. (Tr. 19). At step one of the five-step sequential analysis for determining whether an individual is disabled, the ALJ found that Ruth C. had not engaged in substantial gainful activity during the period from her alleged onset date of February 9, 2016 through her date last insured of September 30, 2018. (Tr. 20).

At step two, the ALJ determined that Ruth C. had the following severe impairments: degenerative disc disease and spondylosis; myofascial pain; dizziness/vertigo; headaches; neuropathy; and bilateral carpal tunnel syndrome. (Tr. 20). The ALJ found that those severe impairments significantly limited Ruth C.'s ability to perform basic work activities as required by SSR 85-28. (Tr. 20).

The ALJ indicated that Ruth C. had the following non-severe impairments: alcohol use, incontinence, and depression. (Tr. 20). In finding that Ruth C.'s non-severe mental impairment of depression did not cause more than a minimal limitation in her ability to perform basic mental work activities, the ALJ determined that she had no limitation in understanding, remembering or applying information. (Tr. 20). The ALJ also found that Ruth C. had no limitation in interacting with others or in concentrating, persisting, or maintaining pace, and a mild limitation in adapting or managing herself. (Tr. 21).

At step three, the ALJ concluded that Ruth C., through the date last insured, did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 21). The ALJ indicated that he considered listings 1.04, 2.07, 11.02, and 11.1 in determining whether Ruth C.'s impairments met or medically equaled a listing. (Tr. 21-22).

After consideration of the entire record, the ALJ then assessed Ruth C.'s residual

functional capacity (RFC) as follows:

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(a) except: only occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling; never climbing ladders, ropes, or scaffolds; only frequent reaching, including overhead reaching, handling and fingering; and needs to avoid concentrated exposure to loud noise, vibrations, bright/flashing lights, as well as hazards including operational control of dangerous moving machinery, unprotected heights, and slippery/uneven/moving surfaces.

(Tr. 22-23). The ALJ explained that in considering Ruth C.'s symptoms he followed a two-step process. (Tr. 23). First, he determined whether there was an underlying medically determinable physical or mental impairment that was shown by a medically acceptable clinical or laboratory diagnostic technique that reasonably could be expected to produce Ruth C.'s pain or other symptoms. (Tr. 23). Then he evaluated the intensity, persistence, and limiting effects of the symptoms to determine the extent to which they limited Ruth C.'s functioning. (Tr. 23).

After considering the evidence, the ALJ found that Ruth C.'s medically determinable impairments reasonably could be expected to produce some of her alleged symptoms. (Tr. 23). However, the ALJ concluded that Ruth C.'s statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the medical evidence and other evidence in the record. (Tr. 23). The ALJ noted that, in regard to Ruth C.'s experiences of degenerative disc disease, myofascial pain, vertigo, headaches, neuropathy, and carpal tunnel syndrome, Ruth C. alleged an onset date of disability as February 9, 2016. (Tr. 23-24). However, he stated that the medical records did not support a finding that she began engaging in substantial treatment until the end of 2016. (Tr. 23-24).

At step four, the ALJ determined that Ruth C. was capable of performing past relevant work as an Order Clerk, sedentary exertional level, and Procurement Clerk, sedentary exertional

3

level, both as she actually performed those jobs and as they were normally performed in the national economy. (Tr. 26). He stated that the work did not require the performance of work-related activities precluded by Ruth C.'s residual functional capacity. (Tr. 26). The ALJ also noted that the work was past relevant work because it was done during the period at issue, it was done long enough for the Ruth C. to learn it, and it was done at or above substantial gainful activity level. (Tr. 26).

The ALJ found that Ruth C. had not been under a disability, as defined by the Social Security Act, from February 9, 2016, the alleged onset date, through September 30, 2018, the date last insured. (Tr. 26).

*Discussion*

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are supported by substantial evidence. **42 U.S.C. § 405(g)** ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive"); ***Moore v. Colvin***, 743 F.3d 1118, 1120–21 (7th Cir. 2014); ***Bates v. Colvin***, 736 F.3d 1093, 1097 (7th Cir. 2013) ("We will uphold the Commissioner's final decision if the ALJ applied the correct legal standards and supported her decision with substantial evidence"). Courts have defined substantial evidence as such relevant "evidence as a reasonable mind might accept to support such a conclusion." ***Zoch v. Saul***, 2020 WL 6883424, at *3 (7th Cir. Nov. 24, 2020); ***Biestek v. Berryhill***, 139 S. Ct. 1148, 1154 (2019); ***Bates***, 736 F.3d at 1098. A court must affirm an ALJ's decision if the ALJ supported his findings with substantial evidence and if there have been no errors of law. ***Roddy v. Astrue***, 705 F.3d 631, 636 (7th Cir. 2013) (citations omitted). However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues."

4

*Lopez ex rel Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).

Disability insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act. The claimant must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. § 423(d)(1)(A)**. The Social Security regulations enumerate the five-step sequential evaluation to be followed when determining whether a claimant has met the burden of establishing disability. **20 C.F.R. § 404.1520**. The ALJ first considers whether the claimant is presently employed and "doing . . . substantial gainful activity." **20 C.F.R. § 404.1520(b)**. If she is, the claimant is not disabled and the evaluation process is over. If she is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities." **20 C.F.R. § 404.1520(c)**; *see Williams v. Colvin*, 757 F.3d 610, 613 (7th Cir. 2014) (discussing that the ALJ must consider the combined effects of the claimant's impairments). Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations. **20 C.F.R. § 401, pt. 404, subpt. P, app. 1**. If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling. However, if the impairment does not so limit the claimant's remaining capabilities, the ALJ reviews the claimant's "residual functional capacity" and the physical and mental demands of his past work. If, at this fourth step, the claimant can perform her past relevant work, she will be found not disabled. **20 C.F.R. § 404.1520(e)**. However, if the claimant shows that her impairment is so severe that she is unable to engage in her past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant, in light

5

of her age, education, job experience, and functional capacity to work, is capable of performing other work and that such work exists in the national economy.  **42 U.S.C. § 423(d)(2); 20 C.F.R. § 404.1520(f);** *see* ***Biestek v. Berryhill,*** 139 S. Ct. 1148 (2019) (upon the request of a disability benefits applicant, a vocational expert's refusal to provide the private market-survey data underlying her opinion regarding job availability does not categorically preclude the expert's testimony from counting as "substantial evidence" but, instead, the inquiry is case-by-case).

Ruth C. requests that the court reverse the ALJ's decision and award benefits, or in the alternative, remand this matter for additional proceedings.  In her appeal, Ruth C. broadly argues that the ALJ erred in not incorporating limitations from all medically determinable impairments, both severe and non-severe, into the RFC and erred in not considering the combined impact thereof.  However, the only argument that Ruth C. discusses in detail is her contention that the ALJ's finding that she could frequently engage in handling and fingering "defies logic." Therefore, the court finds it necessary to address only that issue.

"The RFC is an assessment of what work-related activities the claimant can perform despite his limitations."  ***Young v. Barnhart***, 362 F.3d 995, 1000 (7th Cir. 2004); *see* **20 C.F.R. § 404.1545(a)(1)** ("Your residual functional capacity is the most you can still do despite your limitations"); SSR 96-8p, at *2 ("RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities").  The RFC is based upon medical evidence— including statements from medical sources about what the claimant still can do—as well as "other evidence, such as testimony by the claimant or his friends and family."  ***Craft v. Astrue,*** 539 F.3d 668, 676 (7th Cir. 2008); **20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3).**

SSR 96-8p explains how an ALJ should assess a claimant's RFC at steps four and five of the sequential evaluation. In a section entitled, "Narrative Discussion Requirements," SSR 96-8p specifically spells out what is needed in the ALJ's RFC analysis. This section of the Ruling provides:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

SSR 96-8p (footnote omitted). Thus, as explained in this section of the Ruling, there is a difference between what the ALJ must contemplate and what he must articulate in her written decision. "The ALJ is not required to address every piece of evidence or testimony presented, but [she] must provide a 'logical bridge' between the evidence and [her] conclusions." *Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)); *see Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014). Although the ALJ does not need to discuss every piece of evidence, he cannot ignore evidence that undermines his ultimate conclusions. *Moore*, 743 F.3d at 1123 ("The ALJ must confront the evidence that does not support his conclusion and explain why that evidence was rejected") (citing *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009); *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009); *Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012)).

Ruth C. specifically argues that the ALJ's RFC finding that she could handle and finger frequently "contravenes the logical bridge requirement" and "defies logic that someone with

[her] serious hand/wrist/cervical impairments … could continue using [her] hand/wrist/upper extremities frequently." [Pet. Br. 15]. Therefore, she contends that the handling and fingering limitations should have been no more than occasional. However, Ruth C. provides no argument based on the record that could have been considered by the ALJ, or that the ALJ did not consider, in order to make a finding that she could only handle and finger occasionally as opposed to frequently.

The Commissioner claims that Ruth C.'s argument that the ALJ's finding defies logic is a "lay characterization [] unsupported by any medical opinion." [Comm. Br. 1]. The Commissioner further argues that Ruth C. has failed to show that any reasonable factfinder was compelled to reach different findings than the ALJ did. Nonetheless, the Commissioner states, the ALJ's findings were supported by the opinions of three doctors, objective examinations that repeatedly showed normal upper extremity findings, and Ruth C.'s own orthopedic clinic specialists encouraging her to exercise as opposed to enforcing physical restrictions.

The ALJ found that, beginning in August 2017, Ruth C. reported increased hand and pain numbness, but that her gait remained normal. (Tr. 24). She reported difficulty with grasping, however the ALJ found that, based on medical records, her strength was intact, she had no atrophy, her light touch was intact, her diagnosed carpel tunnel syndrome was noted to be "mild" per imaging, and further imaging revealed no neuropathy. (Tr. 24). The ALJ noted that medical professionals continually encouraged Ruth C. to exercise, as she was not confined to bedrest. (Tr. 24). Clinicians encouraged and prescribed therapy, though Ruth C. refused to fully engage in therapy or complete "at home" exercises. (Tr. 24).

The ALJ stated that while Ruth C. continued to report limb numbness, it was not clinically correlated because clinicians recorded that her sensation was intact. (Tr. 24). The ALJ

8

noted that the medical records from mid-2017 failed to support the severity of Ruth C.'s alleged limitation, because it was often noted that she was only "mildly" limited in her ability to drive, walk, sit, or stand. (Tr. 24). Ruth C. reported that she was independent in her normal activities associated with daily living. (Tr. 24). Medical records also showed that she had a normal gait, was not in distress, had normal posture, normal strength, and a normal heel toe walk. (Tr. 24). Additionally, she was not prescribed surgery or more than conservative treatment. (Tr. 25). Based on the described findings, the ALJ found that the evidence was consistent with the RFC, and Ruth C. failed to provided evidence that she was any more limited. (Tr. 25).

The ALJ's RFC determination that Ruth C. could engage in frequent handling and fingering was supported by substantial evidence. On May 12, 2017, Ruth C. saw Dr. Jeffrey W. Barr who recommended formal physical therapy and pain medication to treat her neck and back pain. (Tr. 297). About two weeks later, Ruth C. saw Dr. Jennifer Evans and reported joint stiffness in her bilateral hands. (Tr. 310). Ruth C. stated that the pain decreased throughout the day but did not resolve. (Tr. 310). As to her extremities, Dr. Evans found "no clubbing, cyanosis, or edema." (Tr. 310). Dr. Evans prescribed pain medications and encouraged Ruth C. to consider physical therapy for low back pain. (tr. 311).

During a July 31, 2017 disability physical appointment, Ruth C. stated she was not able to work due to neck and back pain but made no mention of pain relating to her hands. (Tr. 426-429). Dr. Jan Abdali did report that Ruth C. "ha[d] normal fine motor skills with normal handling of objects." (Tr. 429). During the August 1, 2017 visit with Dr. Barr, he reported that Ruth C.'s gait was normal and that she did not report any pain or irritation with her hands. (Tr. 448-452). Notes from the August 21, 2017 visit reflected that Ruth C. stated her bilateral hands had increased in pain due to her arthritis. (Tr. 436). She stated that she had persistent numbness

9

and early morning stiffness throughout her hands and wrists. (Tr. 436). Upon examination, Dr. Evans found motor strength to be normal in her upper extremities and sensory exam intact. (Tr. 436). Ruth C. was told to continue her pain medication. (Tr. 436).

On November 2, 2017, Ruth C. visited Dr. Barr for a reevaluation of her myofascial pain, lumbar degenerative disc, lumber spondylosis, and cervical spondylosis. (Tr. 524). During the examination, Dr. Barr noted that Ruth C. had a normal gait. (Tr. 524). No complaints of hand or wrist pain or numbness were reported. (Tr. 524-527). Progress notes made by Dr. Evans, dated November 2, 2017, stated that Ruth C. reported persistent numbness and early morning stiffness throughout her hands and wrists and increased weakness in bilateral hands and wrists associated with dropping objects, but she denied increased severity in pain. (Tr. 539). Dr. Evans printed out materials for at-home exercises relating to Ruth C.'s wrist pain and continued her pain medication. (Tr. 540).

On January 30, 2018, Ruth C. saw Dr. Samiullah Kundi for the numbness and tingling in her hands. (Tr. 678). She reported that she had experienced the numbness and tingling for the past three years and that it had gotten worse. (Tr. 678). Dr. Samiullah ordered an evaluation for carpal tunnel syndrome. (Tr. 682). Dr. Samiullah reported that Ruth C. "d[id] not have clinical features of cervical radiculopathy." (Tr. 682). Although, progress notes from that appointment listed bilateral carpal tunnel syndrome as one of Ruth C.'s diagnoses. (Tr. 670).

During the March 6, 2018 follow-up with Nurse Practitioner Catherine Gillig, Ms. Gillig reported that "there was only slight prolongation [in] right median sensory latency consistent with very mild or positional carpel [sic] syndrome" and "no significant abnormalities were identified on the left [hand]." (Tr. 699). Ms. Gillig noted that Ruth C. complained mostly of hand and feet numbness, but her sensory exam was very inconsistent, and the EMG results were

10

not consistent with neuropathy or carpal tunnel syndrome. (Tr. 703). Ms. Gillig recommended that Ruth C. continue taking pain medication and follow-up in six months. (Tr. 703).

On May 30, 2018, Ms. Gillig reaffirmed her March 6, 2018 findings. (Tr. 741). Ms. Gillig noted that while the EMG was not consistent with radiculopathy or neuropathy, due to reported increase of numbness in Ruth C.'s hands and shooting pain down the right side of her neck, Ms. Gillig intended to check the MRI of her cervical spine. (Tr. 746). Ms. Gillig recommended that Ruth C. continue taking her prescribed pain medications. (Tr. 746). On June 6, 2018, the MRI showed multilevel degenerative changes. (Tr. 753).

On June 1, 2018, Ruth C. had a follow-up with Dr. Barr. (Tr. 552-555). Dr. Barr reported that Ruth C.'s motor skills were normal, sensory was grossly intact, reflexes were normal with an ankle jerk, and gait was normal. (Tr. 554). Dr. Barr noted that the June 1, 2018 evaluation of Ruth C. was "stable" and gave her a thoracic spine home exercise program to, among other things, improve function. (Tr. 555).

Ruth C. argues that there must be a rational connection between the facts found and the ALJ's ultimate RFC findings. *See* ***Getch***, 539 F.3d at 480 ("The ALJ is not required to address every piece of evidence or testimony presented, but [she] must provide a 'logical bridge' between the evidence and [her] conclusions") (internal quotations omitted). The ALJ did just that. Not one medical record between May 12, 2017 and June 6, 2018 imposed restrictions on Ruth C. due to her hand and wrist discomfort and numbness. In fact, several medical providers recommended and reiterated physical therapy or at home exercise. Nothing more than pain medication was prescribed to treat her hand pain and discomfort. The ALJ weighed all of the medical records, including those from Ruth C.'s treating physicians and State Agency physicians. Additionally, the ALJ's RFC findings were somewhat more restrictive than the

11

opinions of the State Agency physicians who determined that Ruth C. could complete less than a full range of light work. (Tr. 26). The ALJ noted that the State Agency consultants failed to properly consider Ruth C.'s subjective complaints. (Tr. 26). Therefore, the ALJ found that the record overall established greater limits than those determined by the State Agency consultants. (Tr. 26).

Finally, Ruth C. cites *Hoskins v. Berryhill*, 2018 WL 5262939, at *1 (N.D. Ind. October 23, 2018) as being like the facts of this case. In *Hoskins*, the plaintiff claimed that he had serious hand/wrist/upper extremity impairments as evidenced by positive Phalen's signs, neuropathy, and neuritis, and thus c[ould not] use his hand/wrist/upper extremities frequently." *Hoskins*, 2018 WL 5262938, at *4. The court found that ALJ had "not shown how substantial evidence support[ed] his decision [that the plaintiff could handle and finger frequently as opposed to occasionally], in light of the plaintiff's diagnosis of bilateral hand numbness and carpel tunnel syndrome. It simply d[id] not follow that someone with these conditions could handle and finger frequently, such as at a factory job." 2018 WL 5262938, at *4. However, the more important issue appeared to be the fact that the ALJ relied greatly on "post-dated opinions of the State Agency Consultants," which did not account for post-dated medical opinions that showed the plaintiff was more limited than the State Agency Consultants had found. 2018 WL 5262938, at *4. Therefore, the court found that "it [wa]s unclear why their opinions were given any weight." 2018 WL 5262938, at *4.

The facts giving rise to the issue in *Hoskins* are not as similar as Ruth C. insists them to be. First, the severity of the plaintiff's diagnoses in *Hoskins* were more extreme than Ruth C.'s. Doctors reported that Ruth C. had mild carpel tunnel in her right hand and no significant abnormalities in her left hand. (Tr. 699). Her EMG results were not consistent with neuropathy

12

or radiculopathy, her motor skills were normal, and her sensory was grossly intact. (Tr. 436, 554, 682, 699, 746). More importantly, Ruth C. has not asserted that there was any additional evidence of a material change in her condition that the ALJ did not account for.

Based on the foregoing reasons, the court **RECOMMENDS** that the decision of the Commissioner be **AFFIRMED.**

Pursuant to 28 U.S.C. § 636(b)(1), the parties shall have fourteen days after being served with a copy of this Recommendation to file written objections thereto with the Clerk of Court. The failure to file a timely objection will result in the waiver of the right to challenge this Recommendation before either the District Court or the Court of Appeals. ***Willis v. Caterpillar, Incorporated***, 199 F.3d 902, 904 (7th Cir. 1999); ***Johnson v. Zema Systems Corporation***, 170 F.3d 734, 739 (7th Cir. 1999); ***Hunger v. Leininger***, 15 F.3d 664, 668 (7th Cir. 1994); ***The Provident Bank v. Manor Steel Corporation***, 882 F.2d 258, 260-61 (7th Cir. 1989); ***United States v. Johnson***, 859 F.2d 1289, 1294 (7th Cir. 1988); ***Lebovitz v. Miller***, 856 F.2d 902, 905 n.2 (7th Cir. 1988).

ENTERED this 2nd day of February, 2021.

/s/ Andrew P. Rodovich
United States Magistrate Judge